J-A27035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KAREN COWHER, ADMINISTRATRIX OF THE ESTATE OF JAMES L. COWHER, II, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| SOBHAN KODALI, M.D., ST. LUKE'S UNIVERSITY HEALTH NETWORK AND ST. LUKE'S CARDIOLOGY ASSOCIATES | : : : : : | No. 1111 EDA 2020 |
| Appellants | : | |

Appeal from the Judgment Entered April 7, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2018-C-0264

BEFORE:   STABILE, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED:  FEBRUARY 8, 2021**

Appellants Sobhan Kodali, M.D., St. Luke's University Health Network and St. Luke's Cardiology Associates (collectively, Defendants) appeal from a judgment entered on a jury verdict in favor of the plaintiff, Karen Cowher, Administratrix of the Estate of James L. Cowher, II, Deceased (Plaintiff) in a wrongful death and survival medical malpractice action.  For the reasons set forth below, we affirm the trial court's judgment as to liability and its damages judgment on Plaintiff's wrongful death claim, but vacate the damages

_____

[*] Retired Senior Judge assigned to the Superior Court.

judgment on Plaintiff's survival claim and remand for a new trial on damages with respect to the survival claim.

This action arose out of the death of James L. Cowher, II (Decedent) from cardiac arrest at the age of 48. In September 2015, Decedent had an episode of chest pain and underwent a stress echocardiogram test that was normal. Joint Ex. 1 at 1158, 1850; N.T. Trial, 12/4/19, at 148-49; N.T. Trial, 12/5/19, at 236-55. On July 11, 2016, Decedent saw his primary care physician for episodes of chest pain that were becoming more frequent and severe and that radiated from the chest to his arms and were accompanied by some shortness of breath, nausea, and sweating. Joint Ex. 1 at 1152; N.T. Trial, 12/6/19 P.M., at 15-21, 33-34. Decedent's primary care physician performed an electrocardiogram and had a test done for troponin, a chemical marker of heart damage, both of which were normal. N.T. Trial, 12/6/19 P.M., at 13, 22-23.

Decedent's primary care physician arranged for Decedent to be seen by an affiliated cardiology group, and defendant Dr. Sobhan Kodali, a cardiologist in that group, saw Decedent on July 13, 2016. Joint Ex. 2 at 1-2; N.T. Trial, 12/6/19 P.M., at 23, 25, 39; N.T. Trial, 12/5/19, at 258; Joint Ex. 1 at 1375. Decedent reported to Dr. Kodali that for the last six months he had been experiencing chest pain that radiated to both arms, often with shortness of breath, dizziness, and tingling in his fingers. Joint Ex. 1 at 1375-76; N.T. Trial, 12/5/19, at 264-67. Decedent also reported to Dr. Kodali that he was

regularly running for exercise without symptoms. Joint Ex. 1 at 1375-76; N.T. Trial, 12/5/19, at 269; N.T. Trial, 12/6/19 A.M., at 18-20. Dr. Kodali was aware that Decedent had a family history of premature coronary artery disease, had high cholesterol, and was overweight. Joint Ex. 1 at 1375-76; N.T. Trial, 12/5/19, at 264-65; N.T. Trial, 12/6/19 A.M., at 49. Dr. Kodali did not order or perform any tests other than an additional electrocardiogram, which was normal, and a lipid test, and concluded that Decedent's chest pain was "not cardiac," stating that "[n]o further evaluation is necessary at this time" and that "[o]verall the clinical picture is suggestive of anxiety/panic attacks." Joint Ex. 1 at 1375, 1378; N.T. Trial, 12/6/19 A.M., at 27-28, 95-96.

On August 23, 2016, Decedent suffered cardiac arrest while jogging and died. N.T. Trial, 12/3/19, at 73-78; Joint Ex. 1 at 1531; Plaintiff's Ex. 24, Death Certificate. The pathologist who performed an autopsy on Decedent found that Decedent had blockages of 80% and over 90% in the left main and left anterior descending coronary arteries and listed the cause of Decedent's death as "[f]avor cardiac arrhythmia secondary to ASCVD [arteriosclerotic cardiovascular disease]." Joint Ex. 1 at 1657, 1659, Autopsy Report at 3, 5. The coroner reported the cause of Decedent's death as acute myocardial infarction due to severe coronary artery disease. Plaintiff's Ex. 24, Death Certificate.

On January 31, 2018, Plaintiff, Decedent's widow, brought this medical malpractice wrongful death and survival against Defendants. In her complaint, Plaintiff averred that Dr. Kodali was negligent in failing to recognize that Decedent was suffering from unstable angina and in failing to diagnose Decedent's severe coronary artery disease. Complaint ¶¶15-22, 25, 31; Amended Complaint ¶¶15-22, 25, 31. Plaintiff averred that St. Luke's Cardiology Associates (Associates), Dr. Kodali's practice group, and St. Luke's University Health Network (Health Network), the health network that owns Associates, were liable for Dr. Kodali's negligence. Complaint ¶¶8-12; Amended Complaint ¶¶8-12. Plaintiff averred in her complaint that Dr. Kodali's failure to diagnose Decedent caused Decedent's death and that Decedent died from an acute myocardial infarction. Complaint ¶¶23-24, 27-28, 34; Amended Complaint ¶¶23-24, 27-28, 34.

Plaintiff's cardiology expert opined in his report, dated March 28, 2019, that Dr. Kodali was negligent in failing to diagnose Decedent as suffering from unstable angina and in failing to recommend diagnostic testing, including cardiac catheterization, that would have shown Decedent's severe coronary artery disease, which could have been successfully treated by coronary bypass surgery. Hayek 3/28/18 Report at 5-9. Plaintiff's cardiology expert also opined in that report that Decedent died from cardiac arrhythmia caused by severe left main and left anterior descending coronary artery disease and briefly stated that Decedent experienced conscious pain and suffering before

his death. *Id.* at 8-9. On October 28, 2019, Defendants filed motions in limine to preclude Plaintiff's cardiology expert from testifying that Decedent died of a cause other than acute myocardial infarction and to preclude him from testifying that Decedent experienced conscious pain and suffering. On November 27, 2019, the trial court denied both of these motions.

The case was tried to a jury from December 3, 2019 to December 9, 2019. Seven witnesses testified at trial: a neighbor who was present when Decedent's fatal event occurred, Plaintiff's cardiology expert, Plaintiff's economic expert, Plaintiff, Defendants' cardiology expert, Dr. Kodali, and Decedent's primary care physician.

Plaintiff's cardiology expert testified at trial that Decedent was suffering from unstable angina due to severe coronary artery blockages when he saw Dr. Kodali and that Decedent died from a cardiac arrhythmia caused by insufficient blood supply to the heart as a result of those coronary artery blockages. N.T. Trial, 12/3/19, at 152, 156-58, 166, 172-77, 186-89, 220. Plaintiff's cardiology expert opined that, given the chest pain symptoms that Decedent reported, Dr. Kodali breached the standard of care in failing to diagnose Decedent's unstable angina and in failing to order cardiac catheterization, which would have revealed the blockages and resulted in bypass surgery, and opined that Decedent's untreated coronary artery disease caused his death. *Id.* at 143, 162-64, 169-71, 177, 190-202, 211-13, 215-

20. He also opined that Decedent experienced conscious pain and suffering at the time of his fatal cardiac event. *Id.* at 221.

Plaintiff's economic expert opined that the economic loss from Decedent's death, including all earnings, fringe benefits and value of the loss of his household services, totaled $1,070,145 to $2,700,498, depending on assumptions concerning age of retirement, salary increases, and economic conditions. N.T. Trial, 12/4/19, at 28, 48-60. Defendants stipulated that Associates and Health Network were vicariously liable for Dr. Kodali's conduct. *Id.* at 9-14.

Defendants' cardiology expert opined that Dr. Kodali did not breach the standard of care in concluding that Decedent's chest pain was non-cardiac, given the lack of correlation between the pain and his physical activity. N.T. Trial, 12/5/19, at 34, 39-44, 49-51, 56-59, 66, 81-83, 178-83. Defendants' cardiology expert further opined that it could not be concluded that Decedent's coronary artery disease caused his death because no damage to the heart muscle was found on autopsy. *Id.* at 71-81, 177-78, 183, 186-87.

On December 9, 2019, the jury returned a verdict in favor of Plaintiff and against Defendants awarding Plaintiff $2,475,000 in wrongful death damages and $3,833,000 in damages on the survival claim. Defendants timely filed post-trial motions seeking a new trial, or alternatively a new trial on damages or a remittitur, and Plaintiff moved to add delay damages to the verdict. On April 7, 2020, the trial court denied Defendants' post-trial

motions, granted Plaintiff's delay damages motion, and entered judgment in favor of Plaintiff and against Defendants in the amount of $6,631,642.70. This timely appeal followed.

Defendants present the following issues for review:

1. Whether the trial court erred and abused its discretion in failing to vacate the verdict where Plaintiff failed to prove liability under her new, eleventh-hour cause of death theory by presenting expert testimony identifying a specific standard of care for treatment of cardiac arrythmia (as opposed to other coronary conditions), which Defendants breached and thus caused Plaintiff's harm?

2. Whether the trial court erred and/or abused its discretion in permitting Plaintiff's expert to testify to his assumptions regarding the purported pain and suffering decedent experienced?

3. Whether the trial court erred and abused its discretion in failing to vacate the Survival Act award where the record is devoid of evidence that decedent was conscious, able to feel pain or indeed felt pain immediately prior to death and, thus, any award for pain and suffering is against the weight of the evidence?

4. Whether the trial court erred and/or abused its discretion in denying Defendants' requests for a new trial on damages and/or remittitur, where the jury's Survival Act verdict award of $377,000 per minute (at best) for 2-3 minutes of pain and suffering is grossly excessive, unmoored from the record, and against the weight of the evidence?

Appellants' Brief at 5-6 (suggested answers omitted).

In their first issue, Defendants argue that the verdict is against the weight of the evidence because, as a result of the difference between a myocardial infarction, which is a heart attack, and an arrhythmia as the cause of death, Plaintiff allegedly did not establish a breach of the standard of care

or causation.[1] This Court's review of a claim that a verdict was against the weight of the evidence is limited to determining whether the trial court abused its discretion in denying a new trial. **Brown v. Halpern**, 202 A.3d 687, 703 (Pa. Super. 2019); **Corvin v. Tihansky**, 184 A.3d 986, 992 (Pa. Super. 2018). A party is not entitled to a new trial on weight of the evidence grounds where the evidence presented was conflicting and the fact-finder could have decided in favor of either party. **Brown**, 202 A.3d at 703; **Corvin**, 184 A.3d at 992-93.

Defendants' contention that Plaintiff failed to prove breach of the standard of care and causation is without merit. Contrary to Defendants' assertions, the negligence at issue in this case was failure to diagnose and treat Decedent's severe coronary artery disease, not the diagnosis or treatment of myocardial infarction or cardiac arrhythmia. Complaint ¶¶15-22, 31; Amended Complaint ¶¶15-22, 31; N.T. Trial, 12/3/19, at 162-64, 169-

---

[1] This would normally be a sufficiency of the evidence argument for judgment notwithstanding the verdict (JNOV). Defendants, however, did not move for a nonsuit or directed verdict on the ground that Plaintiff failed to prove negligence or causation. N.T. Trial, 12/4/19, at 177-79; N.T. Trial, 12/6/19 P.M., at 45-54. The only such motion that Defendants made was a motion for nonsuit on any direct liability claims against Associates and Health Network and that motion was granted, limiting Plaintiff's claims against those Defendants to vicarious liability for Dr. Kodali's conduct. N.T. Trial, 12/4/19, at 178-80. Defendants are therefore barred by waiver from seeking JNOV and the only relief that they may seek on this basis is a new trial on weight of the evidence grounds. **Corvin v. Tihansky**, 184 A.3d 986, 990-91 (Pa. Super. 2018); **Haan v. Wells**, 103 A.3d 60, 68 (Pa. Super. 2014).

72, 174-76, 186-202, 211-13, 215-20. The absence of evidence concerning the standard of care for diagnosis and treatment of arrhythmias is therefore irrelevant to whether Plaintiff satisfied her burden of proof.[2]

At trial, Plaintiff's cardiology expert testified that Dr. Kodali breached the standard of care for cardiologists in the diagnosis and treatment of patients who report the symptoms that Decedent reported by failing to diagnose Decedent's severe coronary artery disease, and testified that Decedent's untreated severe coronary artery disease caused him to suffer a fatal cardiac arrhythmia and die. N.T. Trial, 12/3/19, at 143, 162-64, 169-77, 186-202, 211-13, 215-20. With respect to whether Dr. Kodali breached the standard of care, Plaintiff's cardiology expert explained:

> Q. Let's talk about the definition of acute coronary syndrome. How does it commonly present?
>
> A. So the most common presentation of acute coronary syndrome is substernal, chest discomfort, often radiating to the left arm or arms with recent onset with an increase in frequency of severity of symptoms. It can occur at rest or with exertion and is often accompanied by other associated symptoms such as nausea, sweating, dizziness and shortness of breath. So that's your classic, out of the textbook presentation of unstable angina, which is part of an acute coronary syndrome.
>
> *        *        *

---

[2] In the trial court, Defendants also argued that the averments in the complaint that Decedent died of a myocardial infarction constituted a binding judicial admission that barred Plaintiff from introducing evidence at trial that he died from an arrhythmia. Defendants, however, do not argue that issue in this appeal.

Q. And what is supposed to happen under the standard of care if a patient presents to a cardiologist with signs and symptoms of acute coronary syndrome?

A. I either -- you know, if they're having discomfort, you know right there they're going straight to the hospital. And I'm going to check enzymes and an EKG. But catheterization. You need to define what's blocked because you've already got a history from the patient. You already have your risk factor profile of the patient. So you already know this, you know, is or is not an individual who's likely going to develop or already have heart disease. So you're going to treat a 20-year-old with no medical problems differently than a 48-year-old with high cholesterol and a family history, is a little bit overweight. So when you've got the risk factors and you're at the right age and the gender and then you've got the story, you need a cath because, you know, the question is no longer about what is the problem. I think the problem is virtually certain. The question only comes down to where are the blockages -- I know they're severe because your symptoms of acute coronary syndrome imply that you have a severe obstructed and unstable plaque? Is which arteries are blocked, how severely and basically, are you fixable with medications alone, stents or bypass surgery. And the only way you're going to find that out is to do a catheterization ….

*Id.* at 161-64.

With respect to the cause of Decedent's death, Plaintiff's cardiology expert explained:

Q. …[W]hat is your opinion with respect to the cause of his death?

A. Severe coronary artery disease involving the left main and the left anterior descending causing insufficient coronary flow and ventricular tachycardia fibrillation cardiac arrest which are two arrhythmias -- can't tell which one -- but that he would have been shocked by the paramedics for.

Q. How does severe coronary artery disease cause an arrythmia that can lead to death?

A. If you're not getting adequate blood supply to your heart muscle, one of the things that can happen, unfortunately, besides

- 10 -

a heart attack, is what we call sudden cardiac death or cardiac arrest, is that when your heart is being starved of oxygen, your heart can, what we call, fibrillate. All of us now are in a normal heart rhythm, where it's beating in a regular fashion, and that's an organized rhythm and that allows blood to be pumped to create your blood pressure. Ventricular fibrillation is a completely disorganized arrythmia or ventricular tachycardia where the ventricle or main pumping chamber goes so fast and erratic when it's beating that it cannot push any blood out to the body. So it is an arrythmia that is incompatible with life. It's incompatible with a pulse or generally respirations. It causes a cardiac arrest and it looks -- when you see it, it looks like a heart that's wriggling like a bag of worms. It's not doing anything purposeful. And that's what happened to Mr. Cowher.

N.T. Trial, 12/3/19, at 172-73.

These opinions were consistent with the cause of action that Plaintiff alleged in the complaint. Although the complaint averred that the fatal cardiac event was a myocardial infarction, the complaint, like the expert's testimony, asserted that Dr. Kodali was negligent in failing to diagnose Decedent's severe coronary artery disease. *See* Complaint ¶¶15-22, 31; Amended Complaint ¶¶15-22, 31. Indeed, the complaint referred to the risk of myocardial infarction "and/or cardiac arrest" as the reason that further cardiac evaluation was required. Complaint ¶25; Amended Complaint ¶25.

Neither *Pomroy v. Hospital of University of Pennsylvania*, 105 A.3d 740 (Pa. Super. 2014) nor *Maurer v. Trustees of University of Pennsylvania*, 614 A.2d 754 (Pa. Super. 1992) (*en banc*), relied on by Defendants, support their argument that Plaintiff failed to prove breach of the standard of care and causation. In *Pomroy*, there was no proof of causation because the evidence showed that the decedent would have rejected the

treatment that the plaintiff claimed that the defendant physician should have recommended and no proof of breach of the standard of care because the plaintiff's expert's opinion required the physician to refuse to provide medically necessary treatment. 105 A.3d at 745-48. In **Maurer**, the plaintiff's expert repeatedly equivocated about what constituted the standard of care. 614 A.2d at 760-63. Here, in contrast, there was no evidence that Decedent would have refused cardiac catheterization or bypass surgery and, as set forth above, Plaintiff's cardiology expert testified unequivocally concerning the standard of care, that Dr. Kodali breached that standard in failing to diagnose Decedent's coronary artery disease, and that if Dr. Kodali had properly diagnosed Decedent's coronary artery disease, a coronary bypass would have been performed and Decedent would not have died.

In their second issue, Defendants argue that the admission of Plaintiff's cardiology expert's pain and suffering opinion testimony was error and requires a new trial on damages. This Court reviews a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. **McFeeley v. Shah**, 226 A.3d 582, 596-97 (Pa. Super. 2020); **Nobles v. Staples, Inc.**, 150 A.3d 110, 113 (Pa. Super. 2016). An abuse of discretion exists where the trial court overrides or misapplies the law. **Commonwealth v. Taylor**, 230 A.3d 1050, 1072 (Pa. 2020); **Nobles**, 150 A.3d at 113.

Plaintiff's cardiology expert testified with respect to Decedent's pain and suffering:

Q. In addition to the other opinions that you've given today, do you have an opinion regarding whether Mr. Cowher experienced pain and suffering prior to his death?

A. Yes.

Q. And what is that opinion and what's it based on?

A. That, based on the testimony I heard earlier this morning, I believe he did suffer conscious pain and suffering on that run on August 23rd when he realized that something was very wrong before he became unconscious.

N.T. Trial, 12/3/19, at 221. No medical explanation or further basis for this opinion was given by the expert. The "testimony … earlier this morning" that the expert referenced was testimony of the neighbor who saw Decedent collapse. This neighbor testified that she saw Decedent walking slowly, kneeling, and laying down, that Decedent said "I need help," and that Decedent appeared to be "in pain" and "not himself" and "was very distraught." *Id.* at 74-77. The neighbor also testified that Decedent was conscious for approximately three minutes before he passed out. *Id.* at 77-78.

To be admissible, expert opinion testimony must go beyond the knowledge possessed by lay persons. Pa.R.E. 702(a), (b) (requiring that "the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson" and that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); *Nobles*, 150 A.3d at 114; *Snizavich v. Rohm & Haas Co.*, 83 A.3d 191, 194 (Pa. Super. 2013).

In addition, the expert testimony must be based on application of the witness's expertise and must not merely be a lay opinion offered by an expert. *Nobles*, 150 A.3d at 114; *Snizavich*, 83 A.3d at 194-95.

> "It is the job of the trial court to 'assess the expert's testimony to determine whether the expert's testimony reflects the application of expertise or strays into matters of common knowledge.' … Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion. 'Testimony does not become scientific knowledge merely because it was proffered by a scientist.'"

*Nobles*, 150 A.3d at 114 (quoting *Snizavich*) (citations omitted); *see also Snizavich*, 83 A.3d at 194-95. This Court has further explained that

> [t]he exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief.

*Nobles*, 150 A.3d at 114-15 (quoting *Snizavich*); *see also Snizavich*, 83 A.3d at 197.

Plaintiff's cardiology expert's opinion on Decedent's pain and suffering did not satisfy these standards. He did not apply his medical expertise to the facts to which the neighbor had testified. Nor did he point to or rely on any medical or other scientific authority or principles beyond the knowledge of lay persons. Instead, he simply adopted the neighbor's fact testimony as his

purportedly expert opinion. As such, the testimony was nothing more than the expert's personal opinion and was not admissible expert testimony. **Nobles**, 150 A.3d at 114-17; **Snizavich**, 83 A.3d at 194-98. The trial court therefore erred in admitting this expert testimony that Decedent experienced conscious pain and suffering.

Plaintiff argues that even if the admission of this testimony was error, Defendants have not shown that they were prejudiced. We do not agree.

An evidentiary ruling constitutes grounds for reversal only if the complaining party was prejudiced by the ruling. **Wright v. Residence Inn by Marriott, Inc.**, 207 A.3d 970, 974 (Pa. Super. 2019); **Reott v. Asia Trend, Inc.**, 7 A.3d 830, 839 (Pa. Super. 2010), **aff'd**, 55 A.3d 1088 (Pa. 2012). A party is prejudiced where the trial court's error could have affected the verdict. **Wright**, 207 A.3d at 974; **Reott**, 7 A.3d at 839. The damages that the jury could award on the survival claim here were damages for Decedent's pain and suffering and for the loss of his gross earning power, less personal maintenance expenses, for his estimated working life span. **McMichael v. McMichael**, 241 A.3d 582, 587-88 (Pa. 2020); **Kiser v. Schulte**, 648 A.2d 1, 4 (Pa. 1994). Plaintiff's counsel referred to the cardiology expert's pain and suffering testimony in his closing argument. N.T. Trial, 12/9/19, at 79.

Improperly admitted expert testimony has significant potential for prejudice because jurors may perceive expert testimony as having greater

weight and credibility than the testimony of other witnesses. *Commonwealth v. Hopkins*, 231 A.3d 855, 876-77 (Pa. Super. 2020); *see also Masgai v. Franklin*, 787 A.2d 982, 985 (Pa. Super. 2001) (expert testimony "may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen") (quoting *Commonwealth v. Topa*, 369 A.2d 1277 (Pa. 1977)).

> Expert witnesses can have an extremely prejudicial impact on the jury, in part because of the way in which the jury perceives a witness labeled as an expert. To the jury an "expert" is just an unbridled authority figure, and as such he or she is more believable. A witness who has been admitted by the trial court as an expert often appears inherently more credible to the jury than does a lay witness.

*Hopkins*, 231 A.3d at 876 (quoting *Commonwealth v. Smith*, 995 A.2d 1143 (Pa. 2010) (Saylor, J., concurring and dissenting)).

Moreover, it is clear from the verdict that the jury awarded Plaintiff a high amount of pain and suffering damages, even though the evidence showed that Decedent was conscious for only approximately three minutes.[3] Damages

_____

[3] To the extent that Defendants argue that there was no evidence that Decedent experienced any conscious pain and suffering at the time of the fatal event, we do not agree. The neighbor's fact testimony was sufficient to show that Decedent was conscious for a brief period during his fatal cardiac event and appeared to be upset and in some discomfort during that brief period. *Ory v. Libersky*, 389 A.2d 922 (Md. App. 1978), on which Defendants rely does not support their contention that no conscious pain and suffering was shown here. Rather, it held that pain and suffering damages were not recoverable because there was no evidence of any kind that was sufficient to show that the decedent was conscious in the period between the accident and his death where there was no expert testimony that he was conscious and the

for pain and suffering cannot be awarded for periods that Decedent was unconscious. *Cominsky v. Donovan*, 846 A.2d 1256, 1260 (Pa. Super. 2004); *Nye v. Commonwealth*, 480 A.2d 318, 321 (Pa. Super. 1984); *Teamann v. Zafris*, 811 A.2d 52, 65-66 & n.14 (Pa. Cmwlth. 2002), *abrogated on other issue*, *McCreesh v. City of Philadelphia*, 888 A.2d 664 (Pa. 2005). The only evidence of economic damages at trial was Plaintiff's economic expert's testimony and the highest amount of economic damages to which the economic expert testified was $2,700,498. The jury's survival award was $3,833,000, $1,132,502 more than Plaintiff's evidence of economic damages.

Plaintiff contends that the error cannot be held prejudicial because the award could have included pain and suffering for the six-week period between Decedent's visit to Dr. Kodali and his fatal cardiac event and because Defendants did not request an itemized verdict sheet. These arguments are without merit. Plaintiff's counsel represented to the trial court that the only pain and suffering claim was for the brief period of the fatal cardiac event and the only evidence of pain and suffering that Plaintiff's counsel argued to the jury was pain and suffering during that event. N.T. Motion in Limine Argument, 11/26/19, at 95-96; N.T. Trial, 12/9/19, at 79-80. In addition, the

---

decedent did not engage in any communicative behavior or other behavior that showed that he was conscious or in pain. *Id.* at 928-30.

trial court charged the jury that they could award damages for pain and suffering only for the period "from the time of the **injury** until his death." N.T. Trial, 12/9/19, at 145 (emphasis added). The injury here was Decedent's fatal cardiac event, not Dr. Kodali's examination or diagnosis.

While absence of an itemization of damages can affect a court's ability to review a challenge to the amount that a jury awarded for a particular item of damages, *see Birth Center v. St. Paul Companies, Inc.*, 727 A.2d 1144, 1163 & n.16 (Pa. Super. 1999), *aff'd*, 787 A.2d 376 (Pa. 2001), the issue here is whether the improper admission of evidence was prejudicial, not whether the amount of the pain and suffering award was excessive or unsupported. The standard for whether error is prejudicial, as stated above, is whether it **could** have affected the verdict. The ability to ascertain the precise amount of the jury's pain and suffering award is unnecessary to that analysis. The fact that the damages verdict that included pain and suffering was over $1 million more than Plaintiff's expert's highest calculation of economic damages is sufficient for the Court to conclude that this verdict could have been affected, even if an actual amount of pain and suffering damages cannot be determined.

Given the fact that the jury awarded a high amount of pain and suffering damages for a brief period of time coupled with the undue weight that jurors are likely to give to expert testimony, we conclude the admission of Plaintiff's cardiology expert's opinion on pain and suffering was prejudicial error.

The expert testimony on pain and suffering, however, could have only affected one part of the jury's verdict, the amount of damages that it awarded on Plaintiff's survival claim, and could not have affected the liability verdict. No new trial is therefore necessary on liability. Evidence on pain and suffering likewise had no possible effect on or the amount of the wrongful death award, as this award includes only Plaintiff's losses as Decedent's widow, not damages suffered by Decedent. **See** 42 Pa.C.S. § 8301; **McMichael**, 241 A.3d at 588.

Where an error in a wrongful death and survival action has affected only the jury's damages award on the survival claim, a new trial may properly be limited to the damages that the plaintiff seeks on the survival claim. **Rettger v. UPMC Shadyside**, 991 A.2d 915, 933-35 (Pa. Super. 2010); **Davis v. Steigerwalt**, 822 A.2d 22, 30-31 (Pa. Super. 2003); **Bortner v. Gladfelter**, 448 A.2d 1386, 1390 (Pa. Super. 1982). Indeed, Defendants have conceded that the trial court's error can be remedied by a new damages trial limited to the survival claim. Although Defendants in their brief requested a new trial on damages without limiting the request to the survival claim, at oral argument, Defendants stated in response to the Court's questions that errors affecting only the issue of pain and suffering can be remedied by a new trial on damages on Plaintiff's survival claim. Because neither the liability verdict nor the wrongful death damages award could have been affected by the erroneous admission of expert testimony on pain and suffering, we vacate

only the damages judgment with respect to Plaintiff's survival claim and remand for a new trial on damages limited to that claim.

Defendants' remaining issues challenge the jury's damages award on the survival claim as excessive. In light of our conclusion that the survival award must be vacated and a new trial on damages must be held with respect to the survival claim, we need not and do not address these claims of error.

For the foregoing reasons, we affirm the trial court's judgment as to Defendants' liability and its damages judgment with respect to Plaintiff's wrongful death claim, but vacate the judgment as to Plaintiff's survival claim and remand for a new trial on damages with respect to that claim.

Judgment affirmed in part and vacated in part. Case remanded for a new trial on damages limited to Plaintiff's survival claim. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/8/21